IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NANETTE LIEGEOIS      *
                               *
                               *
v.                         *      Civil No. – JFM-15-2919
                               *
JOHNS HOPKINS MEDICINE, ET AL.     *
******

## MEMORANDUM

Plaintiff has brought this action alleging violations of Title VII, the Americans with Disabilities Act and 42 U.S.C. §1981. Defendants have filed a motion to dismiss. The motion will be granted.[1]

I.

A.

Plaintiff was employed by Johns Hopkins University School of Medicine from November 3, 2003 until October 31, 2012. According to the allegations in the complaint, in 2008 her situation with the Hospital became troubled. In 2007 she had been on a search committee to select a qualified candidate for the position of Director of Johns Hopkins' Division of Dermatopathology in the Department of Dermatology. The search committee selected Jacqueline Jukins-Hopkins for the position. Jukins-Hopkins is African-American.

When Dr. Jukins-Hopkins was engaged in contract negotiations, Dr. Charles Cummings, the Medical Director for Johns Hopkins International, said in a staff meeting that Dr. Jukins-

---

[1] As a preliminary matter, claims against the Johns Hopkins University, whom plaintiff alleges was her employer, under Title VII and the ADA must be dismissed because there is no individual supervisor liability under either of these statutes. *Lissau v. Southern Food Servs., Inc.*, 159 F.3d 177, 180 (4th Cir. 1998); *Jones v. Sternheimer*, 387 F. App'x 366, 368 (4th Cir. 2010).

1

Hopkins was "playing games with her contract." In response, Manisha Patel, M.D., called Jukin-Hopkins a "bitch." After the staff meeting, plaintiff told Dr. Cummings that she objected to his comment about Dr. Junkins-Hopkins.

In another meeting Dr. Cummings referred to Dr. Jukins-Hopkins as "that black fucking bitch." As the result of his comments, other Hopkins employees began calling Dr. Jukins-Hopkins "that black fucking bitch," and plaintiff who overheard a doctor comment to his colleague "Did you hear the Department of Dermatology finally hired someone. It's supposed to be some black fucking bitch. Wait till you see what we do to her."

In 2008 Dr. Cummings approached the Chief Financial Officer of Hopkins, Richard Grossi and attempted to convince Mr. Grossi to block Dr. Junkins-Hopkins from being hired. Mr. Grossi informed Dr. Cummings that he could not block Dr. Junkins-Hopkins from being hired. Dr. Cummings told Dr. Rhoda Alani that Dr. Junkins-Hopkins got the job because she was a black woman, and he encouraged Dr. Alani to vocally protest hiring Dr. Junkins-Hopkins. Soon after, other Hopkins employees began to gossip that Dr. Junkins-Hopkins was only selected for Dermatopathology Director because of her race.

Dr. Junkins-Hopkins began employment at Hopkins in February 2008. In March 2008, Dr. Cummings was appointed interim Chair of the Department of Dermatology and became plaintiff's supervisor. He immediately began retaliating against plaintiff by denying her requests for essential staff and equipment. In addition, one of plaintiff's colleagues informed plaintiff that Dr. Cummings was "calling all the good old boys" to try to terminate plaintiff.

In March 2008 plaintiff met with Janice Clements, Ph.D., the Vice Dean for Faculty, and informed her that Dr. Junkins-Hopkins was being subjected to discriminatory treatment and that Dr. Cummings was creating false rumors about Dr. Junkins-Hopkins and telling staff that she

was hired because she is a black woman. Plaintiff further said that Dr. Cummings got people to call Dr. Junkins-Hopkins "that black fucking bitch." Dr. Clements refused plaintiff's request to report the situation to the Dean, and when plaintiff offered to speak to the Dean herself, Dr. Clements told plaintiff that she would not be permitted to see the Dean.

Plaintiff suffered a neck injury and requested an internal ergonomics evaluation by the Safety Department in March 2008. The Department issued a report later that month recommending that Hopkins provide ergonomic accommodations to plaintiff. Plaintiff gave the Safety Department's recommendations to Dr. Cummings and Carolyn Ford, Administrator of Dermatology, in April 2008. Dr. Cummings and Ms. Ford refused to provide plaintiff with any accommodation. Throughout 2008 and early 2009, plaintiff regularly made numerous requests for the ergonomics accommodations and her requests were ignored.

In June 2008 plaintiff was forced to cancel surgical appointments with patients and stopped operating because she could not safely operate without a histotechnician qualified for Mohs surgery. After plaintiff sent this email, a rumor was propagated among Hopkins staff that plaintiff was emotionally unstable, inappropriate, difficult, and unreasonable.

In 2008 plaintiff was selected by Hopkins residents for a Teacher of the Year Award for Otolaryngology. The Department of Otolaryngology Residency Director, who was a close friend and mentee of Dr. Cummings, blocked her receipt of the award.

In August 2008 plaintiff told Dr. Clements that she needed to speak with her to discuss the retaliation and hostile work environment she was experiencing. Dr. Clements refused to speak to plaintiff. Plaintiff then sent Dr. Clements an email explaining how the situation in the Department of Dermatology was continuing to deteriorate and requesting Dr. Clements intervene. Plaintiff's requests for assistance were disregarded by Dr. Clements.

On September 1, 2008, Dr. Sewon Kang was hired as the Chairman of the Department of Dermatology. Dr. Kang is Korean American. The Dean assigned Dr. Cummings to facilitate Dr. Kang's transition to Chairman and to act as Dr. Kang's mentor.

Between January and May 2009, plaintiff sent a number of emails to Dr. Clements, which outlined how the denial of a qualified histotechnician and refusal to accommodate her neck injury violated the accreditation standards promulgated by the College of American Pathologists. These emails were ignored.

A histotechnician was eventually hired. Although the histotechnician was eventually paid a salary of $45,000, the standard salary paid to histotechnicians, Hopkins originally considered only paying approximately $17,000 to the histotechnician.

In May 2009 Dr. Kang sent plaintiff an email notifying her that she was demoted from the position of Director of Surgery and that her contract would not be renewed for the following year. Dr. Patel replaced plaintiff as Director of Surgery.

Plaintiff's neck injury was exacerbated as a result of the failure to provide ergonomics accommodations. As a result, she had to take medical leave for a surgery on her spine on June 29, 2009. While plaintiff was on medical leave for her neck surgery, Dr. Cummings circulated a false rumor that she had taken leave due to a psychiatric illness. In late September 2009, Dr. Kang against attempted to persuade plaintiff to resign from her position early. At the time plaintiff was under consideration for a part-time adjunct associate professor position with the Department of Oncology. In October 2009, plaintiff met with Dr. Hamid Rabb, the Vice Chair of Medicine. Dr. Rabb told plaintiff that he had heard her position was not going to be renewed and she would be leaving Hopkins. He also informed plaintiff that he was in an "open marriage" and offered to use his position to help renew her contract if she agreed to sleep with him.

4

Plaintiff declined Dr. Rabb's proposition, and he began to spread false rumors that she was crazy and unintelligible.

On October 9, 2009, plaintiff agreed to resign from her position. She received a favorable final package and signed a release. Dr. Kang selected Timothy Wang to replace plaintiff as Associate Professor in the Department of Dermatology, Director of the Mohs Surgery Program and Director of the Cutaneous Skin Oncology Program. Dr. Wang was given all requested tools, permissions, and amenities to perform his job within six months of the start of his employment, even though plaintiff's identical requests had been repeatedly denied throughout her seven years of employment at Hopkins.

In October 2009, Hopkins altered and/or deleted its electronic records of plaintiff's employment, causing her professional contributions, position held, employment history, and other professional credentials while at Hopkins to become unverifiable. Plaintiff was unable to obtain medical malpractice insurance because her credentials were unverifiable.

Plaintiff was approved for an appointment to the position of Adjunct Associate Professor of Oncology in February 2010. In May 2011, plaintiff moved to Illinois and procured a position with a dermatology clinic in the suburbs of Chicago. On April 13, 2012, the Director of Oncology notified plaintiff that her contract for the position of Adjunct Associate Professor of Oncology would not be renewed and that her employment with Hopkins would be terminated on October 31, 2012.

B.

On February 5, 2013, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission. She claimed that she was subject to "retaliation" when her appointment as Adjunct Assistant Professor was discontinued. While the EEOC charge

remained pending, plaintiff filed a *pro se* action against Johns Hopkins University and others. She claimed violations under 42 U.S.C. §1981. The case was dismissed without prejudice because of her failure to serve defendants. Plaintiff retained her current counsel, and the case was reopened and an amended complaint was filed. With the agreement of defendant, the action was stayed while the EEOC charge remained pending. The parties also stipulated that if plaintiff *refiled* her Section 1981 claims after receiving a right to serve letter from the EEOC, "October 3, 2013 will be the date used for statute of limitations purposes." On September 25, 2015, plaintiff filed her complaint. She alleges violations of 42 U.S.C. §1981, and violations of Title VII and the ADA.

II.

All claims arising before October 9, 2015 that plaintiff might have had are released. On that date she signed a full release and accepted substantial consideration for the weight of her claims, including nine months' salary and equivalent requirement contributions, plus a $65,000 bonus. She also was tendered the position of Adjunct Assistant Professor of the Oncology Department.

The vast majority of plaintiff's claims are also time-barred. For example, plaintiff's claim that she was subjected to "quid pro quo harassment" by Dr. Rabb is based upon an event that occurred in early October 2009. This occurred years prior to plaintiff's filing of an EEOC complaint, which must be filed within 300 days of the event complained of.

III.

Section 1981 claims are generally subject to a four-year statute of limitations period. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); 28 U.S.C. §1658(a). Section 1981 covers only claims for race and retaliation for complaining about racial discrimination.

To the extent that plaintiff's §1981 claims are based upon retaliation, they are barred by the release. Moreover, plaintiff's agreement to resign occurred well after her alleged complaints about Dr. Junkins-Hopkins and therefore does not meet the "temporal proximity" test. *See Clarke Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Shields v. Fed. Express Corp.*, 120 F. App'x 956, 963 (4th Cir. 2005).

Likewise, plaintiff's efforts to rely upon events that occurred prior to October 3, 2009 to support a claim of continuing violation are unsuccessful. Not only were any claims based upon the alleged acts of discrimination released, they also constituted "discrete acts of discrimination" that are not actionable because they are time-barred. *See Williams v. Giant Food, Inc.*, 370 F.3d 423, 429 (4th Cir. 2004).

A separate order granting defendants' motion to dismiss is being entered herewith.

Date: April 21, 2016

J. Frederick Motz
United States District Judge